**EXHIBIT A-2**

FILED
11/26/2025 8:56 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
ROBIN HOLLAND DEPUTY

DC-25-22083

CAUSE NO. _____

| | | |
|---|---|---|
| MAKENZIE KOCH, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | 160th |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| VERKADA, INC., | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

NOW COMES Makenzie Koch ("Plaintiff"), Plaintiff in the above-styled and numbered cause, and files this her Original Petition ("Petition") complaining of Verkada, Inc. ("Defendant"), and would respectfully show the Court as follows:[1]

### I.    Discovery Control Plan

1.1    Plaintiff affirmatively pleads that discovery should be conducted in accordance with discovery control plan Level 3 under Rule 190.4 of the Texas Rules of Civil Procedure.

### II.    Parties

2.1    Plaintiff is an individual residing in Parker County, Texas,

2.2    Defendant is a foreign for-profit corporation authorized to do business in the State of Texas, who may be served with process by delivering a copy of the Petition and Summons to its Registered Agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 W. 7th Street, Suite 620, Austin, Texas 78701-3218.

---

[1] Plaintiff brings her claims under common law and pursuant to the Notice of Right to Sue dated September 25, 2025, issued by the Equal Employment Opportunity Commission in Charge No. 451-2025-06378.

**PLAINTIFF'S ORIGINAL PETITION**                                                                 **Page 1 of 42**

### III.    Jurisdiction and Venue

3.1    Jurisdiction is proper in this Court as the relief requested falls within the jurisdictional limits of the Court. This Honorable Court has jurisdiction over this matter and over Defendant because: (1) Defendant transacts business within the State of Texas; (2) Defendant has continuous and systemic contacts with Texas; and (3) all or a substantial portion of the events or omissions giving rise to Plaintiff's claims or suit occurred in Texas and involved Defendant.

3.2    Venue is proper in Dallas County, Texas, pursuant to Chapter 15 of the Texas Civil Practice and Remedies Code because, among other reasons, all or a substantial portion of the events involved in this lawsuit occurred in Dallas County, Texas.

3.3    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief over $1,000,000.00.[2]

### 3.4    POSSIBLE ARBITRATION PROVISION, AND IN THE ALTERNATIVE, REQUEST FOR JURY TRIAL

Defendant has represented that there is a binding arbitration agreement relevant to this proceeding. Plaintiff has requested that document, but Defendant has failed to provide it. Accordingly, Plaintiff respectfully demands a jury trial; however, if there is a binding arbitration agreement, Plaintiff will comply with the legally enforceable portions thereof and asks this Court to send this matter for arbitration in Dallas, Texas, but to maintain jurisdiction over this matter for purposes of affirming any arbitration award.

---

[2] Plaintiff reserves the right to amend, decrease and/or increase the amount of damages pled based on evidence developed before trial.

**PLAINTIFF'S ORIGINAL PETITION**                                                      **Page 2 of 42**

### IV.    Factual Background

4.1    Defendant develops and sells cloud-managed physical security solutions, including cameras, access control, and environmental sensors. Defendant's headquarters is in San Mateo, California, and, according to its website, Defendant has 15 offices worldwide.

4.2    Plaintiff began working for Defendant on November 1, 2021. Defendant initially hired Plaintiff as a Mid-Market Account Executive and she worked out of Defendant's Austin, Texas office.

4.3    On February 1, 2023, Defendant promoted Plaintiff to Enterprise Account Executive. In fact, Plaintiff was the first Mid-Market Representative out of Defendant's Austin, Texas office to be promoted to the Enterprise team.

4.4    In or about September 2023, Plaintiff began reporting directly to Christy Olcese ("Olcese"), an Enterprise Sales Director for Defendant. Initially, Olcese gave Plaintiff gifts and handwritten letters encouraging Plaintiff's performance at work. Plaintiff observed that Olcese also expressed an unusual interest in Plaintiff's personal dating life and encouraged Plaintiff to pursue a relationship with a co-worker.

4.5    Plaintiff consistently received great performance evaluations. In Fiscal Year 2024, Plaintiff was Defendant's company-wide #2 best performing employee in terms of revenue and company-wide #3 best performing employee in terms of attainment.

4.6    In February 2024, Defendant held a Sales Kickoff in Las Vegas to celebrate Defendant's top performers and mark a new fiscal year. During this event, on February 6, 2024, Olcese drank heavily and invited Plaintiff to Olcese's hotel room to eat pizza. After eating pizza, as Plaintiff was leaving Olcese's room to return to her own room, Plaintiff intended to give Olcese a quick goodbye hug. However, to Plaintiff's shock, Olcese instead forcibly grabbed Plaintiff and

kissed Plaintiff on the mouth. Plaintiff quickly left Olcese's room and returned to her own room. Plaintiff was still in shock and told her roommate about Olcese's behavior. Olcese's actions were unquestionably unwanted and Plaintiff clearly did not consent to such.

4.7     Despite Plaintiff being very disturbed by Olcese's behavior, Plaintiff was able to publicly remain calm and conduct herself professionally. But privately, Plaintiff continued to worry about the incident – she had been sexually assaulted by her supervisor. Plaintiff really enjoyed her work and was very successful, but now she was uncomfortable interacting with Olcese and feared that the incident was going to negatively affect her job and trajectory. Plaintiff wondered whether Olcese was angry with Plaintiff, whether Olcese was going to treat Plaintiff differently because Plaintiff did not reciprocate, and if Olcese was embarrassed and did not want anyone to know about it. Plaintiff struggled to know what to do and, at times, even tried to rationalize and downplay Olcese's behavior, *e.g.*, by thinking that maybe Olcese believes it is acceptable or normal to behave that way with friends when she is drunk.

4.8     After Olcese forcibly grabbed and kissed Plaintiff, which was clearly and unquestionably not welcomed by Plaintiff, Plaintiff's working relationship with Olcese deteriorated just as Plaintiff feared it might.

4.9     For example, in April 2024, Olcese interjected herself and interfered with a business deal Plaintiff was working on. Olcese had never done anything like this before Plaintiff rejected Olcese's sexually harassing behavior in Las Vegas. Specifically, Olcese inexplicably invited herself to a McKinney ISD school board meeting that Plaintiff was attending to answer any questions that the Board might have regarding Defendant's work. On top of that, Olcese also invited Defendant's new Chief Revenue Officer, Eric Salava ("CRO Salava"), to the Mckinney ISD board meeting ahead of the dinner Olcese had orchestrated later that evening. McKinney ISD

**PLAINTIFF'S ORIGINAL PETITION**                                                    **Page 4 of 42**

was Plaintiff's client, the leadership at McKinney ISD did not know Olcese and Olcese did not check with Plaintiff about any of this or consider the fact that it might be inappropriate. After Plaintiff expressed her concerns to Olcese about how she and CRO Salava's attendance may be perceived by McKinney ISD, Olcese became hostile towards Plaintiff and was very dismissive. Plaintiff was taken aback by Olcese's hostile response, so on or about April 17, 2024, she requested a one-on-one meeting with Olcese's direct manager, Adam Knutson ("Knutson"), without specifying the purpose of the meeting. Olcese then found out about Plaintiff's scheduled meeting with Knutson, so before Plaintiff could talk to Knutson, Olcese scheduled and held a separate Zoom meeting with Plaintiff on or about April 19, 2024. During this meeting, Olcese was extremely hostile and confrontational toward Plaintiff, yelling and cursing at Plaintiff for attempting to speak with Knutson and claiming that she was trying to help Plaintiff. Following Plaintiff's Zoom meeting with Olcese, Knutson put time on Plaintiff's calendar the following week. When Plaintiff was finally able to speak to Knutson about Olcese's behavior, Knutson was dismissive of Plaintiff's concerns and assured Plaintiff that Olcese was just trying to help. Following the McKinney ISD deal closing on or about April 22, 2024, Olcese called Plaintiff on or about April 24, 2024, on her cell phone to apologize. Olcese told Plaintiff that how she (Olcese) handled their one-on-one meeting was the "lowest moment in [her] professional career." At the time, Plaintiff truly believed and appreciated Olcese's apology. However, just a week or two later, Olcese told Plaintiff that her plan for their next one-on-one meeting (the first one for 2024 Q2) was for them to both bring three "asks" for each other so that they could discuss how to help each other improve. Olcese's first ask during that one-on-one turned out to be Olcese asking Plaintiff for "[Plaintiff's] respect." Plaintiff was disappointed that Olcese was using this one-on-one to force

**PLAINTIFF'S ORIGINAL PETITION**                                                    **Page 5 of 42**

or manipulate Plaintiff into taking some blame or responsibility for Olcese's recent appalling behavior, *i.e.*, cursing and yelling at Plaintiff during their previous one-on-one.

4.10    Another example of Olcese's outrageously unprofessional and sexually charged behavior toward Plaintiff occurred on or about August 1, 2024, when Defendant held a team off-site event in Port Aransas, Texas.  After eating dinner, everyone went to the women's condo to socialize. Again, Olcese became very intoxicated. First, Olcese drunkenly confronted Plaintiff by saying that Plaintiff "hated" her for the way she (Olcese) behaved during Plaintiff's McKinney ISD business deal. Next, Olcese yelled out to anyone and everyone who could hear: "I have always been a fan of Kyle and Mak [Plaintiff] boning each other and now they can public bone!" Plaintiff was disturbed by and very uncomfortable with Olcese's behavior. Plaintiff called her engineer the next morning and told him everything that happened. Plaintiff also has screenshots of text messages that her Channel Sales Manager, Arthur Johnson, sent to someone describing Olcese's behavior that same night, *e.g.*, a text saying: "Christy got plastered last night and pressed her boobs all over me...in front of her husband."

4.11    On or about October 28, 2024, Plaintiff received a text message from Olcese forwarding an update from one of Defendant's partners, Solid IT, stating that they were "still waiting on Irving PO." Olcese indicated that she was pushing Solid IT for movement. Although the deal timing was outside of Plaintiff's control, the pressure from Olcese just kept increasing. This pressure was on top of the stress and uncomfortableness that Plaintiff was already experiencing because she had to continue to report to Olcese as the end of Q3 2024 approached. Despite this, Plaintiff responded professionally, explaining that the PO would come when the City of Irving issued it and emphasizing the importance of protecting her customer relationships rather than applying inappropriate pressure.

4.12    On or about October 30, 2024, Defendant's Vice President of Enterprise, Tony Cavallio ("VP Cavallio"), texted Plaintiff thanking her for trying to bring the Coppell deal in by the end of the quarter and emphasizing that it was a tough quarter and Defendant "needed every penny." This text put even more pressure on Plaintiff. This kind of last-minute pressure was not new to Plaintiff. Despite Plaintiff repeatedly communicating to management that these tactics caused her significant mental and emotional strain, it kept happening at the end of every quarter ever since Olcese had become her manager. No adjustments were ever made to improve this, and the same pattern of pressure was applied again at the end of Q3 2024.

4.13    Later that same day (on or about October 30, 2024), Olcese sent a text to Plaintiff saying that she spoke to John (with the City of Irving) who had not checked on the PO status yet. Olcese added that she told Plaintiff she thought both Irving and Coppell would "hit next quarter" and emphasized that orders must be in by 6:00 p.m on October 30th in order to ship in time to count for the quarter. Plaintiff questioned this because the official end-of-quarter date was October 31, and she had successfully closed a $950,000 deal on the final day of the prior quarter that shipped and counted. In response, Olcese told Plaintiff that she simply "got lucky", and that she (Olcese) was "just managing expectations." Plaintiff replied that if the deal did not land this quarter, "at least it will count for next quarter." Olcese then responded with guilt-inducing pressure, saying words to the effect of: "Well I need it, Adam needs it, and Tony needs it… but if you're good with it, I'm glad." Olcese's sarcastic comment implied Plaintiff did not care, despite her consistently hitting quota, and made Plaintiff feel she was personally letting down leadership. After receiving this message and feeling overwhelmed by the unreasonable and unfair pressure, Plaintiff sent her friend Kylie screenshots of Olcese's text messages and texted that she could not take Olcese's behavior anymore and was going to Human Resources. This text on October 30,

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 7 of 42**

2024, clearly demonstrates that Plaintiff had already decided to seek HR intervention *before* any of the events that occurred on October 31, 2024. By October 30, 2024, Plaintiff had already decided to go to HR due to months of mistreatment, retaliation, and inappropriate conduct – and not because of what happened the next day.

4.14    On or about October 31, 2024, Plaintiff began this last day of the quarter working to bring in the Irving and Coppell deals. At approximately 7:00-8:00 a.m., Plaintiff messaged Kyle Holsworth, Defendant's Director of Finance ("Holsworth"), with updates. To Plaintiff's surprise, Holsworth responded by looping in both Plaintiff and Olcese when he emailed them at approximately 8:00-9:00 a.m saying that he was going to "consolidate" communications - effectively taking over deal coordination. Plaintiff provided deal updates indicating both partners were ready but awaiting customer POs. Holsworth asked whether the partners had confidence that the POs would arrive and whether they were comfortable placing orders without them. At approximately 11:33 a.m., Olcese emailed that she had "just spoken to the partner," meaning Mark Finter, President of Solid IT ("Finter"), and that the Irving PO was expected "within 30 minutes." Plaintiff had been excluded from that conversation with Finter. During this time, Olcese and Knutson also had a private discussion about Plaintiff's deals and excluded Plaintiff from that discussion, too. At approximately 3:00 p.m., Olcese emailed Plaintiff requesting that she upload (submit) the Solid IT PO for Irving, so Plaintiff did so. After uploading, Plaintiff called Griffin, the Solid IT rep for Irving, to thank him and, somewhat in shock, said she couldn't believe they got the City of Irving PO in time. Then Griffin replied "Oh, no – we never got Irving's PO. Olcese and Finter just worked it out." Plaintiff then understood this meant that Solid IT sent their own PO without having a PO or a signed quote from Irving. This contradicted every policy and practice Plaintiff had ever been trained to follow by Defendant. Historically, when an end customer could

not cut a PO by quarter-end, Defendant required *both* (1) a signed quote from the end customer and (2) a partner PO before shipping any order. The conduct orchestrated by Olcese and Solid IT was a clear deviation from established company policy.

4.15    When the October 31 PO incident occurred, Plaintiff understood that: (1) the partner never received the customer's PO; (2) the partner submitted a PO without any customer authorization or signed quote; and (3) the submission was orchestrated between Olcese and the partner president without Plaintiff's knowledge. This confirmed for Plaintiff that the situation had escalated beyond interpersonal issues and now involved ethical and compliance concerns. Thus, Plaintiff continued to move forward with her report to HR and would now include the newly discovered PO issue in her report regarding Olcese's ongoing misconduct.

4.16    On November 1, 2024, at approximately 6:00 a.m., Plaintiff received an email from John Chaney ("Chaney") with the City of Irving expressing disappointment that procurement was contacted "around him". Plaintiff immediately apologized via email and then apologized again when Chaney called her that morning after receiving Plaintiff's email response. Plaintiff explained that extreme end-of-quarter pressure from leadership had pushed her to take a step she normally would never take. Between approximately 6:33 a.m. and 7:41 a.m., Olcese texted Plaintiff stating that *she* would respond to Chaney. Plaintiff replied that she had already responded and explained to Olcese - in a lengthy, vulnerable message - that the pressure applied during this end of quarter was severe, overwhelming, and causing significant emotional distress. Plaintiff stated that she could not continue to operate this way and might need to look elsewhere if this was truly the expectation of Defendant's Enterprise Reps. Olcese never responded. Later that morning, Plaintiff Slacked Defendant's Director of Finance, Kyle Holsworth, explaining the damage that leadership

pressure had caused to her customer relationships and asked that rushed, last-minute order approvals not occur again.

4.17    On November 3, 2024, Plaintiff texted Griffin from Solid IT to obtain written confirmation regarding what he told her on October 31st - that Solid IT had submitted a PO without the City of Irving's PO and without a signed quote. Griffin confirmed in writing that they did not have end customer PO or a signed quote ahead of submitting the order to Defendant.  Plaintiff later learned that Olcese had misrepresented this information to leadership. When Olcese told VP Knutson and Director Holsworth that Solid IT "expected to have the PO within 30 minutes," she represented this as the City of Irving's customer PO. Only after the quarter closed and Solid IT reached out saying that $86,000 of the order needed to be returned because it had to go to City Council in December for approval, after Plaintiff raised concerns, did Olcese then attempt to reframe the situation by claiming that Solid IT's president "did not mean the end-customer PO" and that she had misunderstood him. This after-the-fact explanation contradicted her prior statements and appeared to be designed to excuse the improper submission of a partner PO without customer authorization.

4.18    On or about the morning of November 4, 2024, Olcese texted Plaintiff asking whether she had spoken with John Chaney and saying she would "love [Plaintiff's] thoughts," and then followed up asking Plaintiff to call her. Plaintiff reasonably limited communication with Olcese on November 4 because she was preparing to report the broader pattern of harassment, retaliation, and policy violations she had already decided to bring to HR, now compounded by the newly discovered EOQ misconduct.

4.19    On November 4, 2024, Plaintiff emailed Defendant's Chief Revenue Officer, Eric Salava ("CRO Salava"), and CFO Kameron Rezai ("CFO Rezai") an eleven-page document

detailing not only the end-of-quarter misconduct, but also the broader pattern of harassment, retaliation, and inappropriate behavior by Olcese that Plaintiff had already decided she needed to report. This document included: (1) the sexual harassment Plaintiff experienced from Olcese in Las Vegas; (2) the subsequent retaliation when Plaintiff attempted to raise concerns to Olcese's manager; (3) the continued inappropriate conduct at the team off-site in Port Aransas; and (4) the mishandling of Plaintiff's business deals, including Olcese's arrangement with the partner to submit a PO without customer authorization. CRO Salava responded that he would call Plaintiff and would escalate the matter to Human Resources.

4.20    Later that same day, on or about November 4, 2024, Plaintiff saw on Olcese's calendar that Olcese had created and scheduled a private meeting for the following morning, November 5th, titled "Maryanne | Christy Chat." Olcese had invited HR representative Maryanne, and Olcese's manager, Knutson, to this meeting. Knutson had marked the invite with a "?", indicating he did not know the purpose of the meeting. Based on the timing and the fact that Plaintiff had stopped responding to Olcese's messages that morning, it was apparent to Plaintiff that Olcese had scheduled her own meeting with HR immediately after realizing Plaintiff was escalating her concerns to senior leadership.

4.21    On or about November 5, 2024, at 8:46 a.m., Plaintiff shared a screenshot and the detailed document that she had sent to CRO Salava and CFO Rezai with the channel team.  She did this because Channel Sales Manager Arthur Johnson asked about it since it involved partners and channel oversight. Plaintiff's screenshot of the email showed CRO Salava's reply on November 4, as well as CFO Rezai's reply at 6:39 a.m. on November 5 thanking Plaintiff for being upfront and confirming that he passed Plaintiff's documentation to Dervilla Lannon in Human Resources ("HR Lannon") and Bill Berry, Defendant's General Counsel ("GC Berry").

**PLAINTIFF'S ORIGINAL PETITION**                                              **Page 11 of 42**

4.22    Also on or about November 5, 2024, *after* Olcese's meeting with Human Resources, Olcese *immediately* retaliated against Plaintiff by sending a scathing email to both Plaintiff and Kyle accusing them of not notifying her of their travel in some unspecified proper way. Olcese then continued her retaliatory tirade against Plaintiff that day by adding a "Relocation Convo" meeting to Kyle's calendar. Plaintiff's friend, Kylie, noticed the "Relocation Convo" placed on Kyle's calendar and was alarmed, so she sent Plaintiff a text about it. Plaintiff told Kylie she went to upper leadership and HR about Olcese, and Kylie responded to Plaintiff that she was proud of her for doing so. After Plaintiff shared with Kylie that Olcese had emailed Kyle about "being in Fort Worth next week," Kylie questioned why Kyle received an email about being "out of territory." Olcese knew Kyle lived in Los Angeles, far from his territory in Texas, but she was suggesting that if he was in Fort Worth (closer to territory) that she needed to be made aware. Olcese ratcheted up her retaliatory behavior even further by telling Kyle that he had "24 hours" to decide whether he would relocate back to Texas.

4.23    On or about November 8, 2024, Plaintiff sent Kylie a text noting that despite Olcese giving Kyle the directive on November 5, 2024, to make a relocation decision within 24 hours, Olcese had still not followed up with Kyle about it. In fact, Olcese never followed up with Kyle about it. Knutson reached out to Kyle on November 13, 2024, asking if he had made a decision about moving back to Texas.

4.24    On November 6, 2024, HR sent Plaintiff a brief email acknowledging receipt of her documentation. However, no one from HR scheduled a call or spoke with Plaintiff about her allegations for several days. Despite the seriousness of the issues Plaintiff raised - including sexual harassment, retaliation, and the improper handling of two major public-sector transactions - HR did not conduct its first substantive conversation with Plaintiff until November 8, 2024, at

approximately 11:30 a.m. CT. In HR Lannon's email, she acknowledged receipt of Plaintiff's documentation and confirmed that HR was formally investigating both the irregularities in the Irving and Coppell deals and Olcese's managerial conduct. HR Lannon informed Plaintiff that Olcese was instructed to limit her communications with Plaintiff and to include Knutson in all communications to Plaintiff. HR Lannon instructed Plaintiff to do the same and to direct her concerns only to Knutson, Maryanne Gad in HR ("HR Gad"), or HR Lannon herself.

4.25   While HR's purported investigation was underway, Olcese posted a team-wide Slack announcement tagging specific reps and stating her expectations about attending "all-hands" meetings and being "on video." It was obvious to Plaintiff that Olcese's announcement was directed at her and Kyle because they were the only ones on the team who were not initially on the call and had not provided her a reason for not being on video (they were on a site walk). In addition, the tone and content of Olcese's announcement were exactly the same as what Olcese had already been using to publicly target and retaliate against Plaintiff. Olcese posted this announcement on the very same day that HR told her to limit her contact with Plaintiff. This was Olcese's passive aggressive way of continuing to harass and retaliate against Plaintiff.  Following this, Plaintiff personally Slacked VP Cavallio, who led the Enterprise Public Sector calls, letting him know why she was not on the call. VP Cavallio responded with something along the lines of "no worries at all - customers always come first."

4.26   On or about November 13, 2024, Wagma Mohammadi ("Mohammadi") in Defendant's Legal department initially contacted Plaintiff. Mohammadi told Plaintiff that she and GC Berry were reviewing "irregular order" documents and would schedule a time to speak to Plaintiff once their review was complete.

**PLAINTIFF'S ORIGINAL PETITION**                                                           **Page 13 of 42**

4.27    On or about November 15, 2024, Sorin Pirau, Defendant's Senior Manager of Sales Strategy and Operations ("SSO Pirau"), messaged Plaintiff unexpectedly asking whether she wanted to "release" her ENT-SLED holdover accounts early. This had never been requested before and was unusual because SSO Pirau typically only contacts reps after Olcese escalates concerns about reallocating accounts.

4.28    On or about November 19, 2024, Olcese sent a team-wide email update claiming that Coppell ISD had been "sidetracked" at end of quarter while trying to get their DocuSign quote finalized and, therefore, failed to submit their PO. Olcese represented this as the reason the PO had not been received during the end of quarter. Plaintiff knew that Olcese's explanation was false because Plaintiff had a direct conversation with the client. The client was moving internal funds and had communicated their timeline in advance. Olcese misrepresented facts post-end of quarter to leadership, creating a false narrative to justify the failed end of quarter delivery and trying to distance herself from accountability.

4.29    On November 21, 2024, at approximately 4:30 p.m., Plaintiff had her first and only meeting with Defendant's Legal department. GC Berry and Mohammadi met with Plaintiff. GC Berry opened the call by telling Plaintiff that she "did nothing wrong." Plaintiff explained that her concern was not about whether she personally had violated policy, but about how the **process itself had been unethical**, *i.e.*, Solid IT submitted a PO for the Irving deal without ever receiving an end-customer PO or a signed quote, the Coppell order was staged, the partner was charged roughly $750,000 without proper documentation, and Plaintiff was instructed by Olcese to upload a partner PO that she should never have been asked to submit.

4.30    Instead of addressing these concerns, GC Berry told Plaintiff that "everything was fine" because Defendant kept its financial books open until around November 9, giving Solid IT

time to later obtain the correct PO and allowing the company to unwind the improper Irving order (from which approximately $86,000 had to be returned). GC Berry explained that, for this reason, Plaintiff could sign her compensation plan and that Defendant considered the transactions compliant - effectively excusing the improper conduct by relying on the extended closing period rather than Defendant's stated policies.

4.31    On November 22, 2024, after more than two weeks with **no updates**, Plaintiff emailed HR representatives Maryanne, HR Lannon and HR Gad requesting the status of the investigation, a timeline, and next steps. Plaintiff expressed that she was extremely uneasy given the seriousness of the issues she reported. Shortly after sending her email, Plaintiff noticed HR Gad had sent her a Slack message stating that they were "aiming to wrap up the investigation early next week." HR Gad then asked Plaintiff to "confirm the last name of Kelly," referring to the individual Plaintiff shared a room with at the Sales Kickoff in Las Vegas. This was the person who witnessed Plaintiff immediately report that Olcese had forcibly kissed her while intoxicated. HR Gad's question revealed that more than two weeks had passed and HR had still not contacted Plaintiff's primary witness. Moreover, Plaintiff told HR on November 8 that the witness was her roommate named *Kylie*, but HR had somehow misidentified her as "Kelly." All of this indicated that HR was not serious about or interested in investigating Plaintiff's sexual harassment complaint.

4.32    On or about November 27, 2025, HR Gad called Plaintiff to notify her that their investigation was concluded. Plaintiff was told that HR "took the investigation very seriously and were able to substantiate one of the four claims" that Plaintiff brought to HR, *i.e.,* the "the hostile one on one interaction that occurred that [Plaintiff] spoke to her boss about." This was the incident in which Olcese yelled and cursed at Plaintiff when Olcese knew that Plaintiff wanted to talk to

Knutson (Olcese's manager). HR Gad said that their investigation of Plaintiff's other reported concerns was inconclusive. HR Gad claimed that they were taking the matter seriously and had given Olcese a formal written warning. Plaintiff also believes HR Gad mentioned that Olcese was going to take professional development training. HR Gad told Plaintiff that she would remain on the same team but no longer report to Olcese.  Instead, Plaintiff would report to Anthoy Cavallio, Defendant's Vice President of North America Enterprise Sales ("VP Cavallio") until the end of quarter while keeping her same territory, and until they could figure out what would make the most sense in terms of who she would report to at the start of the new fiscal year.

4.33    From on or about November 27 through December 5, 2024, Plaintiff emailed HR Gad and in-house attorney Angela Mclsaac, thanking them for their time and asking whether she would receive any written documentation summarizing the incidents investigated and the actions taken. HR Gad responded that HR does not provide written investigation materials to complainants and suggested they have another call the following week.

4.34    On or about December 5, 2024, they held a follow-up call that HR characterized as Plaintiff's opportunity to "ask remaining questions." HR did not provide any new findings or changes to its November 27 conclusions. Following this call, HR Gad emailed Plaintiff again and noted that Plaintiff was "unhappy with the outcome" of the investigation. HR Gad acknowledged Plaintiff's concern that additional witnesses should have been interviewed, and offered - only at that point - to speak with additional people who attended the team offsite. HR Gad also stated that Olcese had received a written warning and instructed Plaintiff to maintain confidentiality. Plaintiff responded with a detailed written document outlining the concerns, evidence, and gaps in HR's investigation.

4.35    Notably, this December 5th follow-up was one of the few, if not the only, times HR reached out proactively during the entire investigative period, despite the seriousness of Plaintiff's allegations. Plaintiff found it concerning that one of the few instances in which HR initiated contact was to document that Plaintiff was "unhappy with the outcome," rather than to conduct substantive investigative follow-up or address unresolved concerns. This contributed to Plaintiff's reasonable belief that the investigation was incomplete, inconsistent, and driven more by liability protection than fact-finding.

4.36    On or about December 11, 2024, Olcese posted a public Slack message praising multiple teammates for their Texas Association of College and University Police Administrators ("TACUPA") conference contributions. Olcese deliberately excluded Plaintiff from this message. Plaintiff had secured and organized Defendant's participation at the conference and arranged the University Chiefs' dinner.

4.37    On or about December 12, 2024, Plaintiff was unexpectedly and entirely removed from the ENT-SLED Central Slack channel without any warning or explanation. This occurred immediately after Plaintiff posted positive messages and photos from the TACUPA conference which, again, Plaintiff had personally secured for the team and helped organize. Because Slack displayed the message "Makenzie Koch left the channel," multiple teammates contacted Plaintiff, confused and concerned, asking why she had left and whether something was wrong. Plaintiff had not left the channel herself and had received no communication from leadership or HR explaining her removal. Plaintiff emailed VP Cavallio and Knutson, and blind copied HR Lannon, seeking clarification, explaining that her teammates were confused and asking why she had been removed without notice. Plaintiff also asked how she was supposed to respond to her team and whether she was still considered part of SLED Central, since she had been repeatedly told she no longer

**PLAINTIFF'S ORIGINAL PETITION**                                         **Page 17 of 42**

reported to Olcese but remained on the team. Later that morning, HR Lannon responded by claiming that *she*, not VP Cavallio or Knutson, was responsible for not proactively communicating this to Plaintiff. HR Lannon went on to further suggest that this should not impact Plaintiff's ability to do her job because Plaintiff was "not currently reporting to [Olcese]," and because HR believed Plaintiff "had not been active in the team's activities recently." HR Lannon wrote that she "thought it best to remove [Plaintiff] for now," and apologized for not proactively informing her beforehand. Plaintiff responded, clarifying that her reason for not participating was due to the ongoing investigation. Plaintiff also noted that she was told the investigation had concluded and, therefore, reasonably believed participating in team discussions again was appropriate. Plaintiff further explained that her teammates told her that Olcese was telling the team that it was "Makenzie's choice" to no longer be part of SLED Central - something that was completely false and had never been communicated to Plaintiff. This created confusion among her teammates and further contributed to the retaliation she was experiencing. Following this exchange, HR Lannon emailed Plaintiff again and asked her to travel to Austin for an in-person meeting the following Wednesday.

4.38    On or about Sunday, December 15, 2024, Plaintiff contacted HR Lannon to coordinate the in-office meeting for Wednesday, December 18. Plaintiff requested that HR Lannon provide an estimated time so that she could plan her customer schedule and travel from Fort Worth to Austin. HR Lannon responded hours later proposing 11:30 a.m., which Plaintiff agreed to.

4.39    On Tuesday, December 17, 2024, Plaintiff followed up with HR Lannon because she had not received a calendar invitation for the meeting the next day. Plaintiff needed confirmation before she drove to Austin after her 3:00 p.m. customer meeting. HR Lannon responded curtly, "We agreed on the time so it's happening" and then she sent Plaintiff a calendar invitation for the meeting.

**PLAINTIFF'S ORIGINAL PETITION**                                                      **Page 18 of 42**

4.40    On Wednesday, December 18, when Plaintiff arrived for the meeting, she saw that HR Lannon was on the phone during their scheduled meeting time, so Plaintiff waited outside. When HR Lannon and VP Cavallio eventually started the meeting, they told Plaintiff that the investigation was "closed" and then gave Plaintiff an ultimatum: either start reporting directly to Olcese again (despite earlier assurances that she would not have to do so) or they would "help her find a different place in the company." This ultimatum directly contradicted prior communications with Plaintiff and created even more pressure during a time when Plaintiff was already experiencing and reporting retaliation concerns. Plaintiff was extremely distraught by this ultimatum. It was a direct threat to Plaintiff's financial future and a proposed punishment/discipline if Plaintiff chose to no longer report directly to Olcese. After the meeting, Plaintiff sent a written summary to HR and leadership outlining the lack of transparency, missing witness interviews, and the severe financial impact of being forced to start over in a new territory.

4.41    Sometime during December 2024, Channel manager Arthur Johnson told Plaintiff that Caleb Augustin (Head of Channel) had received an unusual email from Olcese asking to "confirm" whether it was a conflict of interest that Plaintiff's brother-in-law, Tyler Weaver, worked on the channel side. Tyler had been at Trilogy for 6+ months and Olcese had never raised a concern before. It was clear that Olcese was looking for any way to manufacture a pretext to take adverse employment action against Plaintiff. Olcese sent that email to Caleb Augustin shortly after HR interviewed Olcese as part of their investigation.[3] Olcese knew that Tyler had been present at the team off-site in Port Aransas when Olcese made the comments that Plaintiff reported to HR, i.e., Olcese drunkenly yelling out to everyone: "I have always been a fan of Kyle and Mak

---

[3] Yet another example of the retaliatory actions taken by Olcese very shortly after she was interviewed by HR concerning Plaintiff's complaints. See also, paragraph 4.22.

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 19 of 42**

[Plaintiff] boning each other and now they can public bone!" After receiving this strange email from Olcese, Caleb Augustin forwarded it to HR on or around December 19, 2024.

4.42    After the December 18 ultimatum meeting, Plaintiff did not hear anything from HR for weeks.

4.43    On or about January 7, 2025, HR Lannon contacted Plaintiff for the first time after the holidays, asking to "check in" regarding December's conversation. Plaintiff explained that she needed clarity regarding what finding her "a different place in the company" meant, *e.g.*, a Global role, starting over with a new territory, losing her accounts, etc.?

4.44    On or about January 9, 2025, HR Lannon messaged Plaintiff asking for a "quick call" and stated it was "about a potential role." During that call, HR Lannon informed Plaintiff that a Global role *might* be available, but that pursuing it would require Plaintiff to give up her Texas SLED territory - a territory she had personally built over the previous three years and had grown into one of the strongest performing regions in the organization. Plaintiff was told she would need to start over from scratch, rebuild pipeline, and likely have a reduction in overall compensation despite the possibility of a slightly higher base salary. Plaintiff explained that such a move would mean abandoning years of established customer relationships, forfeiting future commissionable opportunities she had generated, and taking on significant financial risk. Because the proposed role was not comparable to the position she had earned and built, and was materially detrimental to her career trajectory, Plaintiff told HR she needed time to think.

4.45    On or about January 10, 2025, Plaintiff sent a detailed email to HR Lannon confirming their January 9 discussion. Plaintiff thanked HR Lannon for the meeting and reiterated that the two "new options" presented on December 18 were unexpected and materially different from what she had been told earlier. Plaintiff emphasized she could not make such a major decision

that could have a negative effect on her territory, income, and future trajectory without receiving written details about both options. Plaintiff stressed that being asked to make this decision "ideally within a week" during the final month of the quarter and without information in writing was extremely stressful and unreasonable. She also noted the confusion when she was suddenly invited to the ENT-SLED Central weekly team call labeled "mandatory for directs," despite not being re-added to the Slack channel and not receiving clear communication from leadership or HR that she was expected to rejoin team activities. After considering the severe disadvantages if she moved to another role, Plaintiff ultimately expressed that she wanted to remain in her current role and continue supporting the territory she had spent years developing for the company. Plaintiff did not want to be moved to a different role/demoted and lose all the accounts and commissions she had worked so diligently to earn. Therefore, Plaintiff really had no choice but to report directly to Olcese again.

4.46    Hans Robertson, Defendant's CEO ("CEO Robertson"), called Makenzie directly to discuss what she had been experiencing, including the pressure, confusion, and issues with management. During the call, CEO Robertson acknowledged Plaintiff's situation. However, instead of offering reassurance, protection from retaliation, or some corrective action, he ultimately advised Plaintiff to just "figure out a way to get along with" Olcese. He likened her concerns to when he deals with board members he personally cannot stand because he must still work with them. Further, he commented that "who knows where any of us will be in six months," including Olcese's status at the company, implying instability or lack of confidence in leadership continuity.

4.47    Despite the HR investigation, the formal written warning allegedly issued to Olcese, and the multiple complaints raised about her conduct from October 2024-January 2025, Defendant publicly promoted Olcese during the Enterprise Sales Kickoff at the start of the new

fiscal year. It is reasonable to conclude that Defendant did not appreciate Plaintiff speaking up when Olcese involved her in questionable business practices that upset end customers. This would explain why Olcese was allowed to repeatedly retaliate against Plaintiff with the assistance and support of HR and others in leadership. Defendant rewarded Olcese for her efforts to alienate the rest of the team from Plaintiff, isolate Plaintiff, and discredit Plaintiff, so that Defendant would have a pretext for demoting or terminating her.

4.48    Plaintiff was extremely uncomfortable with reporting directly to Olcese again, so she requested that someone from HR be present during her "one-on-one" meetings with Olcese. HR attended these meetings for the next few months. Then, with Olcese present, HR unfairly put Plaintiff on the spot and asked Plaintiff if they (HR) could stop attending these meetings. Plaintiff did not want HR to stop attending, but she felt pressured to acquiesce because Olcese was there waiting for Plaintiff to answer. Plaintiff knew that if she said she wanted HR to continue coming to the meetings, that Olcese's retaliation would just get worse.

4.49    On or about February 5, 2025, Olcese contacted Plaintiff via Slack asking to get their one-on-one meetings back on their calendars. However, these one-on-one meetings did not happen regularly until after Plaintiff's performance review in April 2025, which is discussed below.

4.50    On or about March 7, 2025, Olcese began another retaliatory passive aggressive campaign against Plaintiff.  Prior to a team call, Plaintiff messaged Olcese to let her know that Plaintiff was driving to the Austin office and that Plaintiff would turn on her camera when she arrived at the office. At first, Olcese replied "sounds good" but then she added "would've been great to know you were coming in the office." Later that morning, during the team call, Olcese

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 22 of 42**

sent a team-wide message regarding "expectations" that all direct reports must: (1) notify her if traveling out of territory and (2) always being on camera during calls.

4.51    On or about March 8 and 9, 2025, after seeing Olcese's message to the team, Plaintiff sent a private message to Olcese stating that she felt targeted by the message and asking Olcese for clarification. Olcese never replied.

4.52    On or about March 10 and 11, 2025, Plaintiff followed up on her message to Olcese. Olcese finally responded the next day saying she was not only referring to Plaintiff. However, she then admitted that the message was for Plaintiff by saying: "You and I have had the same discussion before about communicating travel, so I was disappointed it was still an issue we had to address." Plaintiff responded to Olcese with a detailed message expressing how Olcese's actions made Plaintiff feel targeted and demoralized. Plaintiff pointed out to Olcese that Plaintiff had been working out of the same office for over three years without being required to give prior notice of travel. It was apparent to Plaintiff that Olcese was trying to "build a file" against Plaintiff by reprimanding her for not following rules that Plaintiff had no knowledge of. Plaintiff asked Olcese to provide clear, direct expectations going forward. Plaintiff also sent an email to Knutson and VP Cavallio with the subject line: "Concerns Regarding Slack Messages." In the email, Plaintiff outlined Olcese's pattern of calling Plaintiff out publicly and retaliating against Plaintiff. Knutson's initial response was to defend Olcese. He said he was disappointed by how Olcese communicated with Plaintiff, but that maybe Olcese just wanted to grab a coffee with Plaintiff and rebuild their relationship. In a respectful manner and tone, Plaintiff responded that she was not interested in getting coffee with Olcese after all that she had experienced over the last year and a half. Plaintiff told Knutson that she just wanted to do her job and limit unnecessary interactions while maintaining professionalism.  Knutson then suggested that he, Olcese, and HR Lannon have

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 23 of 42**

a call to "set expectations and move forward." Shortly after, Olcese added HR Lannon to the team's Slack channel.

4.53    On or about March 16, 2025, Plaintiff received a bizarre email from Monica Gregg who oversees Founders Club trips.  The email was addressed to both Plaintiff and Kyle Bettencourt ("Kyle") who were dating at the time. The email stated: "If you are in a relationship with a fellow Defendant employee who also qualifies, then neither qualifier will be eligible to bring a guest. If you have any questions, reach out to HR Dervilla." This meant that while every other employee qualifier was permitted to bring a guest, Plaintiff and Kyle were told that they had to share one room and were not allowed to bring guests. Plaintiff had registered her engineer, May Thakur, to be her "plus one." He did not qualify to go himself but Plaintiff wanted to bring him because she would not have qualified without his help. This arbitrary, inequitable and unjust "rule" was a clear message of continued harassment and retaliation.

4.54    On or about March 18, 2025, Plaintiff attended a strategic City of Dallas product development meeting with Defendant's full product leadership team to discuss future roadmap needs and what new features the City of Dallas required to move forward with Defendant. Attendees included Adil Abbas, Aditya Anigra, Pete Pacent (Head of Product), May Thakur (Engineer), Sgt. Reinhart and Lt. Douglas with the City of Dallas Police Department, and Brandon Griffin.

4.55    On or about March 27, 2025, after Plaintiff's meeting with HR Lannon, Knutson, VP Cavallio, and Olcese to address Plaintiff's concerns about Olcese's targeted Slack message, Olcese sent Plaintiff a follow-up email reiterating her position. Olcese wrote that her Slack post was "not pointed at you," that she "purposely did not call you out," and that "ideally you would naturally give me a heads up that you were coming into the Austin office." Again, Olcese denies

that the message was targeted at Plaintiff but then makes a statement indicating that it was, in fact, about Plaintiff. Olcese added that "expectations are the same across the team" and asked that "we both work on communicating more openly." Again, it was apparent to Plaintiff that Olcese was still using this matter to "build a file" against Plaintiff by reprimanding her for not following a rule that Plaintiff did not know existed.

4.56    On or about April 3, 2025, Olcese gave Plaintiff a performance review for the closing fiscal year. For the first time in Plaintiff's career with Defendant, Plaintiff was given a performance rating of "3" out of a possible 5 on a performance evaluation. Even though Plaintiff was ranked #5 company-wide that fiscal year for sales and attainment, the "areas for improvement" section was twice as long as the "strengths" section, and the feedback was personal and subjective, not data- or behavior-based. Olcese commented that she gave Plaintiff this low score on her evaluation due to Plaintiff's "attitude". Olcese provided no examples of when Plaintiff allegedly had a bad attitude or was disrespectful.

4.57    On or about April 3-5, 2025, Plaintiff sought unbiased feedback from several trusted colleagues and former managers regarding the fairness of Olcese's review. Each confirmed that the tone and content were unprofessional, overly personal, and nonconstructive.

4.58    On or about April 14, 2025, Plaintiff received a message from Olcese stating: "Hey Mak, wanted to let you know I'm meeting with Dwight Goodwin and Coppell ISD tomorrow when I'm in DFW from 2-3 and I'd love for you to join. In full transparency, he reached out to me last week when you were out of office expressing frustration that you'd scheduled and canceled on him three times…". She added that she told him she would meet him while in town to "make him feel cared for." This is yet another example of Olcese reprimanding Plaintiff in a passive aggressive manner and attempting to create negative documentation about Plaintiff. Plaintiff replied by

clarifying that she had only rescheduled once due to neck pain and an upcoming procedure, and shared proof with Olcese that Mr. Goodwin had followed up asking to reschedule for April 10, but then failed to reply when Plaintiff proposed April 8 instead. Olcese responded, "I understand… I kind of get the feeling that he has a chip on his shoulder because of the him vs. Trotter situation in the past… do you think that's a possibility?"

4.59    During the month of May 2025, Olcese was largely out of the office on vacation, which resulted in Plaintiff having minimal direct communication or documented incidents with Olcese, with the exception of the incidents discussed below.

4.60    During the month of May 2025, Plaintiff's grandmother who had recently undergone hip surgery, had to be hospitalized for infection and entered hospice. On or about May 22, 2025, Plaintiff and Kyle visited her before traveling to California the next morning to see Kyle's grandmother who had fallen and broken her hip.

4.61    On or about May 23, 2025, Olcese emailed Plaintiff, Cameron Breck ("Breck"), and Alyssa Riley asking them to complete a certification for the Real-Time Crime Center ("RTCC") pilot group by end of day. She emphasized that "your feedback matters as we look to roll this out across the broader org." Olcese followed up later via a Slack message reiterating that we needed to complete it. Plaintiff politely responded and asked Olcese if participation in the RTCC pilot was compensated, explaining that the extra work (weekly meetings, exercises, feedback forms) was becoming overwhelming while managing large accounts and existing RTCC opportunities. Olcese replied: "Comp on RTCC pilot? No, it's not something you're comped separately on, but it's a privilege. If you don't have capacity to participate, we need to give your spot to another rep who can take advantage of it. Keep in mind pilot participation allows access to Ben Jones, so if you chose not to participate, you wouldn't have him as a resource." Plaintiff

intended to quickly reply to this message, but upon landing in California, Plaintiff received a call and learned that her grandmother had passed away.

4.62    On or about May 28, 2025, Plaintiff replied to Olcese's last message on May 23rd regarding the RTCC Pilot Program. Plaintiff explained that she had intended to reply on May 23rd before receiving the call about her grandmother's passing. Plaintiff emphasized her appreciation for the opportunity to collaborate and learn from Ben Jones, while also respectfully expressing concern about the additional pilot requirements, *e.g.*, knowledge checks, renaming ops, building full account plans, formal MEDDPICC documentation, and group role plays. Plaintiff explained her concern that all of the additional requirements had begun to feel like they were well beyond the normal scope of their positions but did not come with additional compensation. Plaintiff noted that Jones's role had originally been positioned as supporting all reps with RTCC deals, not just reps in the pilot, but Plaintiff also said she understood if her spot needed to be offered to someone else.

4.63    On or about June 2, 2025, Plaintiff asked her engineer why Olcese kept responding to customer threads and unnecessarily copying Knutson. This was not normal and, based upon Olcese's prior behavior, Plaintiff understood that this was Olcese being defensive, seeking attention and visibility, and becoming overly involved in an attempt to protect herself.

4.64    On or about June 3, 2025, Breck texted Plaintiff about a Slack exchange between Alyssa Riley and Olcese, noting: "She's just defensive because Alyssa's fired up we're not going to this conference. That Slack was weirdly passive-aggressive."  Breck shared the same perception of Olcese's behavior as Plaintiff.

4.65    On or about June 4, 2025, Plaintiff's colleagues texted each other after a team call during which Olcese began singing despite the fact that their teammate, Bobbie, who was being

pushed out of the company, was also on the call. Everyone found Olcese's behavior inappropriate and it made them uncomfortable. Later that same day, Olcese Slacked the team acknowledging Plaintiff's marketing suggestion saying: "Thanks for the nudge," and admitting that "things may have been slipping through the cracks."

4.66    On or about June 5-6, 2025, Plaintiff was out of the office for her grandmother's visitation and funeral.

4.67    On or about June 8-13, 2025, Plaintiff attended the Founders Trip in the Bahamas with other top company performers including Olcese, VP Cavallio, and CRO Salava.

4.68    On or about June 16, 2025, Plaintiff had a one-on-one meeting with Olcese. After briefly asking Plaintiff about her grandmother, Olcese immediately criticized Plaintiff's "empty calendar" over the prior two weeks. Plaintiff explained that during the past two weeks she had been grieving and had also attended the Founders Trip (a company-sanctioned trip). This was just another example of Olcese's lack of empathy and her baseless scrutiny of Plaintiff.

4.69    On or about June 17, 2025, Plaintiff learned that one of her teammates inherited all of a former rep's accounts without any communication. Plaintiff reached out to Olcese, Knutson, and SSO Pirau asking how territories were distributed and weighted.

4.70    On or about June 18, 2025, Plaintiff confirmed through follow-up that account reallocations had occurred with no notice to the team members.

4.71    On or about June 20, 2025, Plaintiff texted CRO Salava and VP Cavallio about Channel Sales Manager Arthur Johnson's resignation, calling it a "massive loss." CRO Salava replied he wanted to call Johnson and asked for his number but never followed through. Plaintiff also texted VP Cavallio separately about Johnson's departure and he replied "Huge [expletive] loss. They need to fix channel comp ASAP. Talked about on [CRO Salava's] exec call Monday."

Arthur Johnson texted Plaintiff saying that he spoke with Ceci Scholten ("Scholten") for an hour about Olcese, quoting Scholten describing Olcese as "selfish, useless, stressful… spawn of Satan."

4.72    Also on or about June 20, 2025, Breck texted Plaintiff during a team call saying: "Our team calls seem to be getting more and more tense." Plaintiff replied jokingly, "Yeah, she was on something extra today." Breck also questioned future team structure. After the team call, Scholten texted the team because she was confused by Olcese's comment that "Kyle needs to be at the San Antonio conferences," noting it was inaccurate and "just a [Olcese] move."

4.73    On or about June 21-24, 2025, Plaintiff traveled to Houston and organized a Morgan Wallen concert event for customers and prospects. The event was attended by the City of Dallas, City of Austin, San Antonio ISD, Belton ISD, and others. One of Plaintiff's colleagues on the Select Team texted Plaintiff asking about the Morgan Wallen suite and joked that she did not attend because she "didn't want to run into [Olcese]." Olcese's poor reputation apparently extended outside of Plaintiff's immediate team. After the Morgan Wallen event, Plaintiff stayed for the Texas Education Technology Leaders ("TETL") Conference on Sunday through Tuesday. Then Plaintiff attended a San Antonio happy hour that the team put together for Duncanville ISD, the McKinney ISD team, other customers, partners, and prospective customers.

4.74    On or about June 23, 2025, Plaintiff Slacked Olcese requesting to record their one-on-ones via Clari for organizational purposes. Olcese replied, "No problem at all. I do need to reschedule though."

4.75    On or about June 25, 2025, Plaintiff sent a territory analysis to Olcese and other leadership and asked about the logic for the way territories were allocated. Olcese thanked Plaintiff saying "We'll take a look and dive deeper next week."

4.76    On or about late June 2025, Plaintiff met with Olcese and SSO Pirau regarding territory allocation. SSO Pirau said quotas were based on having a mix of K-12, public sector, and higher ed projects – not actual size (e.g., Dallas ISD vs. Coppell ISD).

4.77    On or about June 30, 2025, during a weekly one-on-one meeting with Olcese, Plaintiff noticed an attached document named "Mak Christy Notes." Olcese attempted to record the meeting through Clari software, but she could not figure out how to do it. Plaintiff also noted to Olcese that the meeting was marked "private" and Olcese claimed that she did not know why. All of this indicated to Plaintiff that Olcese was retaliating against Plaintiff by selectively documenting her and continuing to try to manufacture a pretext so that she could get Plaintiff terminated.

4.78    Later that same day, Plaintiff texted Scholten who said, "We all know she only cares about being VP and not our manager… she just wants heavy hitters, but even heavy hitters need to be coached and mentored… she was a cheerleader, which is not a team sport, really." There was widespread negative sentiment about and dissatisfaction with Olcese's leadership.

4.79    On or about July 2-10, 2025, Defendant distributed a Pulse Survey. Plaintiff and other teammates submitted low ratings and negative feedback regarding Olcese's leadership.

4.80    On or about July 17, 2025, Plaintiff noticed that Olcese had a meeting scheduled with HR Lannon. Plaintiff texted her counterparts about it. Plaintiff's engineer commented, "I bet she asked for this meeting and [Lannon's] EA booked it - probably a defense mechanism because she knows negative feedback is coming in during her Pulse survey." Scholten added that Olcese had been doing a lot of "professional development" lately using company funds, including getting a leadership coach, and said "She's trying to outsmart the system." Another teammate said, "This had to have been the lowest Pulse survey she's received."

**PLAINTIFF'S ORIGINAL PETITION**                                    **Page 30 of 42**

4.81    On or about July 18, 2025, Plaintiff received a Slack message from Knutson saying "Hi MaKenzie, happy Friday, hope you're doing well. I want to come out and spend a day with you in the field. Would Tuesday 8-5 work or 8-6? Are you doing the iLUG event in Houston on 8-4?" In over two-plus years, this was Knutson's first time to ever even suggest that he wanted to visit Plaintiff's territory. Later that same day, Plaintiff forwarded/sent a screenshot of Knutson's message to her teammate, Scholten, who splits DFW with Plaintiff, asking if she had received the same outreach from Knutson. Scholten confirmed that she had not. Plaintiff found this to be strange. Knutson framed his interest as wanting to go "wherever he could help," so Plaintiff did not understand why Knutson did not also reach out to Scholten. Plaintiff replied to Knutson that she and Kyle would be in California the week of Aug 4 (8/4–8/6) working out of Defendant's headquarters in San Mateo. Knutson responded that he would like to sync with them there as well, saying, "Okay let me get back to you on dates. Would love to sync with you and KB at HQ the week of 8-4 as well."

4.82    On or about July 21, 2025, Knutson followed up with Plaintiff: "Hi Mak, okay I checked my calendar - the week of 9-8 works for me. I'll likely fly to Texas Monday night, could take meetings 9-9 and 9-10, then maybe Houston later that week. Can you work on setting up meetings for us as we get closer?" I responded, "Sounds good, are there specific accounts you're hoping to meet with?" Knutson said, "Wherever I can help make a difference and whoever wants to meet that week - City of Dallas would be nice too." Plaintiff confirmed.

4.83    On or about July 30, 2025, Plaintiff sent a Slack message to Knutson regarding team concerns about quota discrepancies and patch assignments - specifically questioning how rep Breck received a growth rep ramping quota despite inheriting existing customers and an accepted deal registration from January 21 (the Kamal deal). Plaintiff expressed that this had negatively

impacted team morale and seemed inconsistent with how other reps' quotas were structured. Knutson responded that "[Breck] is a ramping rep, so he gets the same quota any new mid-market pull-up would get." Plaintiff replied clarifying that Breck was given a growth rep quota similar to others like Matt Brizendine and Scholten, who had no existing customers.

4.84    On or about July 31, 2025, Knutson followed up saying he looked further and confirmed Breck inherited multiple existing customers (Judson, Baxter, Edinburg, Bastrop). Knutson explained that the reason Breck remained on a growth number was that the quota difference between strategic and growth was ~$70K for the first three quarters and they wanted to ensure Breck's success after recent rep churn. Later that day, Plaintiff participated in Zoom meeting with Olcese, Carina (a new Channel Manager), Scholten, and Alissa Riley to discuss partner strategy. Plaintiff created an Excel sheet for everyone to track target partners. When Olcese mentioned she knew who the Digi reps were, Plaintiff said that she did not and asked Olcese to fill in those names on the Excel sheet. Olcese responded dismissively and told Plaintiff that she could find them herself with "a simple Google search." While everyone was still in the Zoom meeting, Plaintiff sent Olcese a Slack message asking her to add the Digi rep names she mentioned to the Excel sheet. Olcese refused, saying she wanted Plaintiff to plug in the ones that Plaintiff was working on, and then Olcese sent Plaintiff only partial information instead of just updating the shared file.

4.85    Throughout the month of July 2025, Plaintiff noticed that all of her one-on-ones with Olcese were marked "Private" on her calendar. Plaintiff is not sure whether Olcese was doing this prior to July 2025, but she noticed in July that her teammates' one-on-ones with Olcese were visible to the team while Plaintiff's were not. In addition, each of Olcese's meeting invitations to

**PLAINTIFF'S ORIGINAL PETITION**                                                      **Page 32 of 42**

Plaintiff had a Word document attached titled "Mak Christy Notes." None of Plaintiff's counterparts' one-on-ones had any attached documents.

4.86    On or about August 1-10, 2025, Kyle and Plaintiff were in California. They worked from Defendant's headquarters in San Mateo from August 4-6, 2025. Prior to their trip, as discussed above, Knutson had expressed wanting to visit Plaintiff and Kyle's Texas territory that same week, but Plaintiff informed Knutson that they would be in California during that time, so Knutson had suggested meeting them for lunch at Defendant's headquarters instead.

4.87    On or about August 5, 2025, Plaintiff and Kyle met Knutson at noon for lunch. Knutson asked how they were doing and acknowledged the difficulty of their substantially increased quotas, noting that this was a tough year. Knutson said that reps who had closed $10M+ in the past two years would be receiving an additional 10,000 RSUs to balance out discrepancies. Also, Knutson asked Plaintiff and Kyle how things were going with the team. Plaintiff and Kyle shared that morale was low and that Olcese provided limited value in leadership or call support. Knutson thanked Plaintiff and Kyle for their feedback and said he would focus on coaching Olcese and developing her further in his one-on-ones.

4.88    On or about August 11, 2025, Plaintiff had a one-on-one with Olcese.

4.89    On or about August 13, 2025, Plaintiff received a text from Olcese stating: "I know you're out tomorrow but are you out all day or would you be able to join a 9am meeting about a bus deployment for Tyler ISD and have the opportunity to hold over the account while I hunt for the new rep." Olcese sent this to Plaintiff despite Plaintiff's calendar showing PTO for August 14-17, 2025, for Plaintiff's best friend's bachelorette trip.

4.90    On or about August 14-17, 2025, Plaintiff attended her best friend's bachelorette trip in Florida.

4.91    On or about August 19-21, 2025, Plaintiff had a number of partner meetings lined up, including with Lynk in Weatherford, Texas, with Ben Jones and the RTCC team, and a dinner in Dallas with GTS Technology Solutions.

4.92    On or about August 22, 2025, Plaintiff spent time with her family that morning because her mother was having surgery.

4.93    On or about August 25, 2025, Olcese called Plaintiff on her cell phone and they had a one-on-one call. Olcese brought up the upcoming team off-site event and acknowledged that Plaintiff had a scheduled shoulder surgery the next day on August 26, 2025. Olcese confirmed she was aware that Plaintiff would likely join the team off-site event remotely and she expressed no issue with that plan.

4.94    On or about August 26, 2025, Plaintiff had her shoulder surgery. Olcese sent the official team off-site event agenda which listed Plaintiff and Pat Nevins as presenters on "Local Law Enforcement." At around 3:26 p.m. that afternoon, Plaintiff received a Slack message from CRO Salava asking "How are you doing?" and then noting he heard the Dallas deal was moving along. Plaintiff replied confirming progress and informed him that she had just had shoulder surgery and would be in a sling for six weeks. The next day, CRO Salava responded to Plaintiff saying "Let me know if you're up for lunch next week or the week after," meaning sometime in early September 2025.

4.95    On or about August 31 – September 1, 2025, Plaintiff reached out to Pat Nevins about connecting and reviewing their presentation that they were assigned to give together over "cracking the local code."

4.96    On or about September 1, 2025, Plaintiff emailed Olcese and Knutson giving them an update on her condition post-surgery.

4.97    On or about September 2-4, 2025, Defendant had the team off-site event. As discussed above, note that the agenda sent out on August 26, 2025, for this event included both Plaintiff and Kyle as presenters during the event.

4.98    On or about September 2, 2025, Plaintiff learned that multiple team members used Zoom to make their presentations remotely during the off-site event. However, Plaintiff and Kyle were excluded from making presentations and told that it was not possible for them to make presentations remotely. Plaintiff continued to question this because she knew other team members had presented remotely. Further, Olcese was well aware that Plaintiff had prepared and was ready and able to make a presentation. After Plaintiff had questioned Olcese about the presentations, Olcese then texted Kyle and suggested to Kyle that Plaintiff might need to take medical leave because Plaintiff seemed to be having a hard time. Olcese never communicated to Plaintiff her alleged concern for Plaintiff or suggested to Plaintiff that she might need to take medical leave. Talking to another employee, and not Plaintiff herself, about Plaintiff needing medical leave is completely inappropriate. Olcese was not concerned about Plaintiff's well-being. Olcese was concocting a false narrative that Plaintiff was or might not be physically and/or mentally well enough to do her job. This was another effort by Olcese to discredit and isolate Plaintiff. In the alternative, if Olcese genuinely believed that Plaintiff needed medical leave or had a medical issue that could affect her work, and then Defendant terminated Plaintiff's employment just a few days later, this raises serious questions about whether Defendant may have also violated the Family and Medical Leave Act ("FMLA") and possibly the Americans with Disabilities Act ("ADA").

4.99    On or about September 4, 2025, Plaintiff reached out to Knutson to express her confusion about being excluded from the off-site event and from making her presentation. Knutson responded to Plaintiff claiming that there was "no Zoom link due to room size and number of

presenters." Plaintiff responded to Knutson that her exclusion felt unreasonable and that her request for a Zoom link was a reasonable accommodation. Plaintiff also let Knutson know that she would be taking this issue to HR. After communicating with Knutson, Plaintiff went to look back at Olcese's August 26, 2025, agenda again and discovered that it has been changed - Plaintiff's and Kyle's names had both been removed as presenters. After seeing this, Plaintiff followed up with Knutson about his planned in-territory visit (originally scheduled for Sept 2–4) and sent him a Slack message expressing her deep frustration over how leadership had handled her recovery from surgery, had excluded her from the off-site event, and exhibited an overall lack of care and communication. Plaintiff referred to her prior HR incident with Olcese and described the emotional toll caused by the exclusion and lack of empathy. It was obvious that leadership's unreasonable and inexplicable behavior was discrimination, harassment and retaliation.

4.100  On or about September 8, 2025, Plaintiff's one-on-one with Olcese was by phone instead of Zoom. The conversation was normal. Olcese did not raise any concerns with Plaintiff about her conduct, performance or anything else. Plaintiff and Olcese discussed the Dallas PD deal and procurement timeline. Later, Plaintiff had a meeting with Joseph O'Hara. He flagged a possible deal-structure change via a new subsidiary that could force a discount from 40% to 50%, lowering the commission by ~$40,000-$50,000, and reducing the deal value from $4.2 million to $3.6 million. O'Hara advised Plaintiff to book a time with VP Cavallio to discuss the issue. Plaintiff scheduled time to meet with VP Cavallio – she found a time slot on Wednesday, September 10, 2025 and sent VP Cavallio a meeting invitation. VP Cavallio's Executive Assistant, Nicole, sent Plaintiff a message asking for the purpose of the meeting. Plaintiff responded that it was about the Dallas deal structure. Nicole then asked to move Plaintiff's meeting to Tuesday, September 9, 2025, at 9:00 a.m., so Plaintiff updated the meeting invitation for that date and time.

4.101   On or about September 9, 2025, Plaintiff joined her 9:00 a.m. meeting with VP Cavallio expecting to discuss the Dallas deal restructuring with him. Unexpectedly, an HR representative, Alice, was also in the meeting. VP Cavallio abruptly told Plaintiff that she was terminated effectively immediately and that it was an HR decision. Plaintiff asked why she was being terminated. VP Cavallio stated, "no improvements in attitude." VP Cavallio explicitly stated that the termination was not performance-based and thanked Plaintiff for her contributions. Plaintiff asked for examples or clarification regarding her attitude, but VP Cavallio and Alice did not provide any. Alice attempted to add that there had been "some partner feedback," but when Plaintiff asked which partners, Alice refused to specify. VP Cavallio told Plaintiff that she would receive a separation agreement and that if the Dallas deal closed by October 31, 2025, she would still be paid the commission. As soon as Plaintiff's call with VP Cavallio and Alice ended, Plaintiff's access to her work laptop and accounts were cut off and she was unable to retrieve any open work product or files. Plaintiff asked to add coverage to her upcoming customer meetings because she was worried that her calls would not be covered. VP Cavallio and Alice thanked Plaintiff for doing this. When Plaintiff asked VP Cavallio and Alice to confirm the reason for her termination, they stated that it was due to "no improvements in attitude" and they made no mention of "partner feedback." Throughout the day, Plaintiff received an outpouring of messages, calls, notes, and flowers from colleagues expressing their shock about her termination. At approximately 4:50 p.m., a separation agreement was delivered to Plaintiff.

4.102   A colleague told Plaintiff they noticed on the calendar that there had been a meeting between VP Cavallio, Olcese, HR Lannon and Knutson on the evening before Plaintiff's termination.

**PLAINTIFF'S ORIGINAL PETITION**                                           **Page 37 of 42**

4.103   Plaintiff also learned that another long-tenured employee ("G"), a Founders Club member and top AE for eight years, was terminated in person at Defendant's headquarters the same day that Plaintiff was terminated. G was presented with a fully prepared separation agreement immediately during his termination conversation. Plaintiff was not sent a proposed agreement until hours later at the end of the day. G's termination occurred after a month-long HR investigation into an incident where he was allegedly assaulted by a company executive who was a close friend of CRO Salava.

4.104   Defendant wrongfully terminated Plaintiff's employment on September 9, 2025. As a result of the aforementioned acts and omissions of Defendant, Plaintiff now sues.

### V.    Causes of Action

5.1     Alternative Pleadings. To the extent necessary, each of the claims set forth below is pled in the alternative.  Plaintiff references and incorporates Section IV above into each claim set forth below as if same had been set forth fully therein.

5.2     VIOLATION OF TEXAS LABOR CODE §21.142 AND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – SEXUAL HARASSMENT, DISCRIMINATION AND RETALIATION

Plaintiff realleges and incorporates the facts and allegations set forth above as if they were fully set forth herein.

Plaintiff was sexually harassed on the basis of her sex by Olcese in the scope of her employment with Defendant, during Defendant's work events, and during working hours. Olcese's unwelcome sexual advances were unwanted and her sexually charged behavior towards Plaintiff was repeated. Defendant purposefully ignored, or worse, allowed and covered up Olcese's harassment and retaliation, and kept Olcese in a supervisory position over Plaintiff.

**PLAINTIFF'S ORIGINAL PETITION**                                                    **Page 38 of 42**

Defendant knew or should have known that the sexual harassment, discrimination and retaliation was occurring but did not take prompt and effective remedial action. Defendant acted with complete disregard for Plaintiff's rights and safety.

As a direct and proximate result of the Defendant's acts and/or omissions, Plaintiff has suffered damages. Plaintiff is entitled to judgment against Defendant for actual damages to be determined by the trier of fact and punitive damages in a sum that is not less than three (3) times the amount of Plaintiff's actual damages to punish Defendant and to deter similar acts in the future.

5.3     QUID PRO QUO SEXUAL HARASSMENT

Plaintiff realleges and incorporates the facts and allegations set forth above as if they were fully set forth herein.

Olcese had supervisory authority over Plaintiff. Olcese began retaliating against Plaintiff soon after Plaintiff rejected and did not reciprocate Olcese's sexual advances. Defendant made Plaintiff's submission to Olcese's sexual advances and sexual harassment a term or condition of Plaintiff's employment, either explicitly or implicitly, and/or Plaintiff's submission to the sexual advance and/or continued sexual harassment was used as the basis for a decision affecting Plaintiff's employment.

As a direct and proximate result of the Defendant's acts and/or omissions, Plaintiff has suffered damages. Plaintiff is entitled to judgment against Defendant for actual damages to be determined by the trier of fact and punitive damages in a sum that is not less than three (3) times the amount of Plaintiff's actual damages to punish Defendant and to deter similar acts in the future.

5.4     HOSTILE WORK ENVIRONMENT

Plaintiff realleges and incorporates the facts and allegations set forth above as if they were fully set forth herein.

Defendant, through Olcese and other of Defendant's employees, subjected Plaintiff to a hostile work environment based on her sex. Defendant Olcese's sexual advances, other sexually charged behavior, and retaliation had the purpose or effect of unreasonably interfering with Plaintiff's work performance, creating an intimidating, hostile and offensive working environment.

As a direct and proximate result of the Defendant's acts and/or omissions, Plaintiff has suffered damages. Plaintiff is entitled to judgment against Defendant for actual damages to be determined by the trier of fact and punitive damages in a sum that is not less than three (3) times the amount of Plaintiff's actual damages to punish Defendant and to deter similar acts in the future.

5.5     NEGLIGENT RETENTION AND/OR SUPERVISION

Plaintiff realleges and incorporates the facts and allegations set forth above as if they were fully set forth herein.  Defendant knew or should have known about Olcese's history of sexual harassment and retaliation based on Plaintiff's previous complaints. Defendant breached its duty to Plaintiff by continuing to employ Olcese and/or failing to adequately supervise Olcese despite Defendant's knowledge of her propensity to sexually harass and retaliate against employees. Furthermore, Defendant kept Olcese in a position of power where she could routinely continue such behaviors and even forced Plaintiff to either go back to reporting to Olcese or be moved to a position that would result in Plaintiff losing highly significant compensation.

As a direct and proximate result of the Defendant's acts and/or omissions, Plaintiff has suffered damages. Plaintiff is entitled to judgment against Defendant for actual damages to be determined by the trier of fact and punitive damages in a sum that is not less than three (3) times the amount of Plaintiffs' actual damages to punish Defendant and to deter similar acts in the future.

**PLAINTIFF'S ORIGINAL PETITION**                                      **Page 40 of 42**

5.6     NO WAIVER

By filing this lawsuit, Plaintiff does not waive or release any rights, claims, causes of action, or defenses or make any election of remedies that she has, but expressly reserves such rights, claims, causes of action and defenses.

## VI. Conditions Precedent

6.1     All conditions precedent to Plaintiff's right to recovery have been performed, have occurred, and/or have been waived.

## VII.     Relief Requested

7.1     Actual Damages.  As a result of the wrongful acts of Defendant, as alleged above, Plaintiff has suffered injuries and actual damages in a sum which is within the jurisdictional limits of this Court, and Plaintiff seeks to recover all such actual damages from Defendant.

7.2     Exemplary Damages.  The acts of Defendant complained of herein were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice. In order to punish Defendant for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiff seeks recovery from Defendant of exemplary damages as provided by Chapter 41 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE.

7.3     Attorneys' Fees.  Plaintiff retained the undersigned attorneys at the law firm of Hill Gilstrap, PC, to represent her in this action, and she has agreed to pay the firm reasonable and necessary attorneys' fees in connection with her claims against Defendant. Plaintiff is entitled to and is seeking compensation for the reasonable and necessary attorneys' fees incurred and to be incurred in bringing these claims and in all appeals of this suit, as permitted at law, in equity and/or pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer and that, upon final hearing or trial of this matter, Plaintiff be awarded judgment against Defendant for the full amount of her actual damages, exemplary damages, pre- and post-judgment interest at the maximum rate allowed by law, her attorneys' fees and costs, and such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

/s/ *Frank Hill*
Frank Hill  SBN 09632000
fhill@hillgilstrap.com
Heather M. Castillo SBN 24027794
hcastillo@hillgilstrap.com
**HILL GILSTRAP, P.C.**
1400 W. Abram Street
Arlington, Texas 76013
(817) 261-2222
(817) 861-4685 fax

**ATTORNEYS FOR PLAINTIFF**